Peter Neufeld*
(New York Bar No. 1020841)
Nick Brustin*
(New York Bar No. 2844405)
Anna Benvenutti Hoffmann*
(New York Bar No. 4412011)
Katie McCarthy*
(New York Bar No. 5583141)
Kate Fetrow*
(New York Bar No. 955937)
* *Pro Hac Vice Applications Pending*
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081 Phone • 212-965-9084 Fax
peter@nsbcivilrights.com
nick@nsbcivilrights.com
anna@nsbcivilrights.com
katie@nsbcivilrights.com
katef@nsbcivilrights.com
John Thomas
(Idaho Bar No. 6727)
166 Martinsburg Lane
Idaho Falls, LD 83404
jthomas@co.bonneville.id.us

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Christopher Tapp, an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. |
| v. | ) |
| | ) **COMPLAINT AND DEMAND FOR** |
| | ) **JURY TRIAL** |
| The City of Idaho Falls, Jared Fuhriman, | ) |
| Steven G. Finn, Ken Brown, Curtis Stacey, | ) |
| Phillip Grimes, Kent Livsey, and Steve Roos | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AND JURY DEMAND

Plaintiff Christopher Tapp, by and through his attorneys, the law firm Neufeld Scheck & Brustin, LLP, and John Thomas, alleges as follows:

### INTRODUCTION

1.  Christopher Tapp spent an unimaginable 20 years, 1 month, and 22 days wrongfully imprisoned, and 21 years and 2 months wrongfully convicted, for the 1996 rape and murder of Angie Dodge—a crime he did not commit and had absolutely nothing to do with.

2.  Angie Dodge was actually raped and murdered by Brian Dripps, who lived across the street from her and acted alone. Recent DNA testing has confirmed that Dripps was the source of the semen and hair found on Dodge's body. When brought in for questioning, Dripps confessed to raping and murdering Dodge. He also acknowledged that he had acted alone and that he did not know Tapp. Dripps has been charged with the rape and murder of Angie Dodge and is currently awaiting trial.

3.  Tapp's wrongful imprisonment was the direct result of egregious misconduct by Defendant officers of the Idaho Falls Police Department ("IFPD") and the City of Idaho Falls. Defendants knew or should have known that Tapp had nothing to do with the crime, because the objective evidence from the crime scene indicated that there was a single perpetrator, pretrial DNA evidence excluded Tapp as a potential source of the semen found on the victim's body, and absolutely no physical evidence connected him to the crime.

4.  But despite Tapp's innocence, Defendants engaged in a coordinated campaign to wrongfully convict Tapp for Dodge's murder.

5.  In particular, Defendants coercively and abusively interrogated Tapp for about sixty hours, repeatedly threatening him with death, lying to him, and falsely promising him leniency if he

2

told them what they wanted to hear. Defendants also continuously used coercive and manipulative sham polygraphs on Tapp—not to get to the truth—but in order to coerce Tapp into giving five distinct, false and fabricated confessions.

6. When Tapp first spoke to the police, he told the truth: that he knew nothing about the crime and indeed had never even been to Dodge's apartment. Tapp only falsely confessed under Defendants' unrelenting and constant pressure and manipulation, including their use of multiple sham polygraphs, false promises of leniency, death threats, lies, and manipulation.

7. Each of the five false confessions that Defendants coerced Tapp into giving precisely fit Defendants' theory of the murder at the time they were given. And, as Defendants learned new information and their theory of the crime changed, rather than acknowledge the truth—that Tapp is innocent—Defendants coerced new confessions from Tapp that fit their evolving theory.

8. Moreover, because he is innocent, Tapp had no information about the crime. And so, for each of the five false confessions that Defendants coerced from Tapp, Defendants broke the rules and fed Tapp key non-public details about Dodge's murder, and then falsely reported that those details had come from Tapp, and that those details corroborated Tapp's confessions.

9. When Defendants first spoke to Tapp, he truthfully denied any knowledge of the crime. But Defendants, months into a high-profile investigation without a suspect, were unsatisfied with the truth. So, Defendants coerced Tapp into falsely stating that Defendants' suspect at the time—a young man named Benjamin Hobbs, who was friends with Tapp—had confessed to Tapp that he killed Dodge.

10. But Defendants were still unsatisfied with Tapp's confession. And so they coerced Tapp into falsely confessing to a second story: that Tapp had been at Dodge's apartment the night of

3

the murder, had seen Hobbs attack Dodge with a knife, and then, frightened, had run away only to return later to see Dodge's body.

11. But, shortly after Defendants had wrung this false confession from Tapp, Defendants learned that DNA evidence excluded both Tapp and Hobbs as the source of the semen found on Dodge's body—meaning the fabricated confessions that Defendants had wrung from Tapp were demonstrably false.

12. Rather than acknowledge the truth—that Tapp was not at all involved in Dodge's murder—Defendants instead wrung a third confession from him, this time feeding Tapp another name: Jeremy Sargis. In this false confession, Defendants coerced Tapp into saying that Tapp, Hobbs, and Sargis had entered Dodge's apartment and then Hobbs and Sargis had attacked Dodge.

13. But, yet again, the evidence quickly demonstrated that the story Defendants coerced from Tapp was false: Additional DNA testing revealed that Sargis was not the source for the semen at the scene, either.

14. Defendants then forced Tapp into a fourth false confession. In this version of the story, Sargis was not at the scene, but rather Tapp, Hobbs, and a third man had purportedly entered Dodge's apartment. Because Defendants did not have a name to feed Tapp for this unknown third man, this time, Tapp was unable to name the third "perpetrator," Defendants also forced Tapp to falsely confess, in this version of events, that Tapp held down Dodge's arms while Hobbs and the third man had sexually assaulted her.

15. Defendants were still unsatisfied with Tapp's four false confessions. And so they coerced a fifth final, false confession from Tapp to pin the blame on Tapp himself. In the fifth and final

4

version of events, Hobbs had threatened Tapp into participating in the crime, and Tapp had then cut Dodge across the breast.

16. To shore up this false confession, Defendants also coerced a vulnerable teenaged girl, Destiny Osborne, into falsely reporting that she heard Tapp confess to the crime. After Tapp's conviction, she admitted that her story was completely fabricated, had been fed to her by Defendants, and that she had only repeated Defendants' false story because Defendants had threatened and coerced her.

17. Absolutely no physical or forensic evidence tied Tapp to this crime; the key evidence offered against him at trial was the false confession that Defendants had extracted from Tapp, the "corroborating" facts that Defendants had fed to Tapp and then falsely reported came from him, and Osborne's coerced false statement.

18. By 2009, the existence of exculpatory DNA evidence and other evidence proving Tapp's innocence was obvious and widely available. Indeed, even the victim's mother recognized his innocence and actively advocated for Tapp's release. However, the IFPD actively suppressed or otherwise wrongfully failed to act on newly discovered information that would have resulted in Tapp's immediate release. In 2009, the IFPD was given the opportunity to perform Y-STR DNA testing to identify the perpetrator's paternal line and thus identify the perpetrator—which would have cleared Tapp's name and secured his release a decade early—but the IFPD declined. Instead of fulfilling their legal and constitutional obligations to help secure the release of an obviously innocent man, the IFPD buried or wrongfully represented the evidence and the circumstances of the investigation in refusing to perform the additional testing and search.

5

19. On July 17, 2019, more than twenty-two years after Tapp was wrongfully arrested for a murder he did not commit, the Seventh Judicial District of Idaho Falls, County of Bonneville held a hearing in which Judge Alan Stephens announced he was going to vacate and dismiss the charges against Tapp. "As far as this court is concerned," Judge Stephens explained to Tapp, "you are innocent of the convictions you have been living under for the past 20-plus years. I don't think any of us could imagine what it would be like to experience imprisonment for something we didn't do . . . I'm just glad it could be corrected at this time." Shortly thereafter all convictions were vacated and charges dismissed on the basis of Tapp's actual innocence. Tapp's wrongful conviction and continued wrongful imprisonment was not the work of rogue, low-level officers at the IFPD. Rather, it occurred in one of the most high-profile investigations ever conducted by the IFPD, with direct involvement by supervisors and senior officials at the Department, including the Chiefs of Police Kent Livsey and Steve Roos.

20. Alternatively, Tapp's wrongful imprisonment was the result of an investigation and post-conviction misconduct so grossly negligent, negligent, reckless, or deliberately indifferent to Tapp's liberty interests so as to amount to a constitutional deprivation of his civil rights.

21. Tapp's actual innocence is widely recognized by leading national experts, courts, and even the victim's mother. Post-conviction DNA testing has repeatedly confirmed that there was only one perpetrator, Brian Dripps, and excluded Tapp as the source of any the perpetrator DNA evidence found at the crime scene.

22. As a direct and proximate result of Defendants' actions and omissions, Tapp sustained injuries and damages, including loss of his freedom for more than twenty years, loss of the most productive years of his adult life, pain and suffering, mental anguish, emotional

distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

23. Moreover, Tapp sustained discrete, traumatic personal and bodily injuries, some life-threatening, that were actually and proximately caused by the Defendants' actions, errors, or omissions—including not only their initial investigatory misconduct but their constitutional failures in post-conviction years leading to Tapp's continued wrongful imprisonment.

24. Even if the City of Idaho Falls and/or individual Defendants may not have expected or intended to continue to imprison an innocent man or cause these grave injuries, defendants are nonetheless legally responsible under 42 U.S.C. § 1983 because these injuries are the foreseeable result of the defendants' recklessness, negligence, or deliberate indifference to Mr. Tapp's rights, their policies and procedures, and their failure to train and supervise their employees.

25. Mr. Tapp—now free and finally exonerated—brings this lawsuit to hold those who illegally caused his wrongful conviction and over two decades of wrongful imprisonment accountable.

## JURISDICTION AND VENUE

26. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Tapp's rights as secured by the United States Constitution.

27. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

28. Supplemental jurisdiction over Tapp's state law claims exists pursuant to 28 U.S.C. § 1367(a).

29. Venue is properly laid in the District of Idaho under U.S.C. § 1391(b), in that this is the District in which the claim arose.

30. Tapp respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

31. Tapp has complied with the requirements of Idaho Tort Claims Act § 6-901 et seq., and served Defendant the City of Idaho Falls with a Notice of Claim on December 20, 2019, and an Amended Notice of Claim on January 17, 2020.

**PARTIES**

32. Plaintiff **Christopher Tapp** was wrongfully arrested, indicted, prosecuted, tried, convicted, and imprisoned by the acts of Defendants in this Complaint. He is, and at all times relevant herein was, an individual residing in the State of Idaho.

33. Defendant **City of Idaho Falls** is a municipality incorporated in the State of Idaho. At all times relevant to this action, the Idaho City Falls Police Department is and was a part, and under the responsibility, of the City of Idaho Falls.

34. Defendant **Jared Fuhriman,** at all times relevant herein, was employed by the IFPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Idaho Falls. Fuhriman went on to serve two terms as the mayor of Idaho Falls. He is sued in his individual capacity.

35. Defendant **Steven G. Finn**, at all times relevant herein, was employed as a Detective by the IFPD, acting under color of law and in his individual capacity within the scope of

8

employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Idaho Falls. He is sued in his individual capacity.

36. Defendant **Ken Brown**, at all times relevant herein, was employed as a Detective by the IFPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Idaho Falls. He is sued in his individual capacity.

37. Defendant **Curtis Stacey** was employed as a Sergeant by IFPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Idaho Falls. He is sued in his individual capacity.

38. Defendant **Phillip Grimes** was employed as a Detective by the IFPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Idaho Falls. He is sued in his individual capacity.

39. Defendant **Kent Livsey**, at all times relevant herein, was the duly appointed and acting Chief of the IFPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Idaho Falls. He is sued in his individual capacity.

40. Defendant **Steve Roos**, at all times relevant herein, was the duly appointed and acting Chief of the IFPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Idaho Falls. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### *Brian Dripps rapes and murders Angie Dodge*

41. In the early hours of June 13, 1996, Brian Dripps, who was in his thirties, broke into the apartment of his neighbor, eighteen-year-old Angie Dodge, raped her, and murdered her with a knife.

42. Dripps, who was known to be violent, lived across the street from Dodge at the time of the crime but had no social contact with her. He was more than a decade older than Dodge.

43. Dripps acted alone. Chris Tapp, who was nineteen years old at the time, did not know Dripps and did not have anything to do with this crime.

44. Chris Tapp is completely innocent of the Dodge rape and murder.

### *Defendants investigate the murder for months but fail to arrest real killer*

45. Responding to a 911 call, IFPD officers arrived at the apartment the next morning and began their investigation. Defendants Sergeant Curtis Stacey and Detective Ken Brown were among the first officers at the scene.

46. Defendants found Dodge's body lying in the bedroom next to the bed with her throat slashed. She also had multiple wounds to her chest and hands. Her blue sweatpants were pulled down and her purple t-shirt was pulled up. There were blood splatters on the wall near the body.

47. Confronted with the extensive crime scene, Defendants took only a few dozen photographs, rather than hundreds of photographs as would have been standard for police investigations of homicides at the time. In addition, the few photographs Defendants did take were haphazard; they lacked a ruler and identifying placard, which would have been essential to permit a viewer to understand the scale and relevance of the photographs, and which was the standard practice for police investigations of homicides at the time.

10

48. Defendants knew from the evidence at the scene that the crime had a single perpetrator. They also collected or supervised the collection of samples for a rape kit from Dodge's body and collected samples of bodily fluids from the scene.

49. Defendants interviewed Dodge's neighbors and friends. They learned Dodge had last been seen alive around 12:20 a.m. on June 13 when friends who had been visiting with her left her apartment.

50. The case quickly grew into one of the highest-profile cases that IFPD had ever worked. The Chief of Police, Kent Livsey, quickly became directly involved in supervising the investigation, including providing multiple statements about the progress of the investigation to the press.

51. Within days of the murder, as part of their investigation, IFPD officers questioned the true perpetrator, Brian Dripps. Dripps, who lived in a basement apartment across the street from Dodge, admitted to the police that he was out until 3:00 am the night Dodge was raped and murdered—the very window of time that the crime occurred—and claimed to be too drunk to remember anyone he would have seen. Despite this suspicious statement, Dripps's proximity to Dodge, and his violent reputation, Defendants either failed to investigate Dripps further or failed to report the results of any investigation they did conduct. Although the IFPD took blood samples for DNA testing from at least *sixty-five* other men during their investigation, Defendants did not take a sample from Dripps. If Defendants had done so, they would have correctly solved the murder and spared Tapp.

52. Moreover, on information and belief, two police officers on bicycles were covering that neighborhood in the early morning hours of June 13, 1996—the night of the crime, and at a time Dripps had told the police he was out on the street. However, these officers either failed

11

to document their interactions that night, or thereafter destroyed any documentation of those interactions.

53. Instead, Defendants learned that Dodge was part of a group of friends that spent time along the Snake River, which runs through the center of Idaho Falls and is accessible at various points to the public.

54. Defendants interviewed multiple members of that group of friends, including Chris Tapp.

55. Tapp, then nineteen years old, was a lifelong resident of Idaho Falls.

56. Tapp gave a voluntary statement to Defendant Phillip Grimes in November, answering questions about who Dodge had interacted with at the Snake River. Tapp truthfully told Grimes that he had never been to Dodge's apartment. Along with dozens of other teenaged boys and young men, Tapp also voluntarily gave a blood sample in late 1996.

57. Consistent with the objective evidence at the crime scene and Defendants' theory at this point in the investigation that the crime had been committed by a single perpetrator, once these young men were excluded as the source of the semen at the scene, Defendants no longer pursued them as suspects.

***Defendants focus their investigation on Benjamin Hobbs after learning Hobbs had been arrested on unrelated charges in Nevada***

58. After nearly six months of investigation into the murder, Defendants had failed to follow up on their interviews with the true perpetrator, Dripps, and their investigation was faltering. Then, on January 6, 1997, Defendants learned that a young man named Benjamin Hobbs— who was one of the teenagers that hung out at the Snake River—had been arrested on an unrelated rape charge in Ely, Nevada. Hobbs had been an acquaintance of Dodge and was a friend of Tapp.

59. Facing mounting pressure to solve this high-profile crime, Defendants, out of desperation, decided to focus their investigation on Hobbs (and his friends to the extent they might provide evidence incriminating Hobbs), despite the fact that absolutely no evidence linked Hobbs or any of his friends, including Tapp, to the crime.

60. The very next day, Defendants Jared Fuhriman and Grimes drove Tapp to the police station to question him.

**_Defendants subject Tapp to nearly sixty hours of coercive and manipulative interrogations and sham polygraphs to wring multiple false confessions from him_**

61. Defendants first interviewed Tapp on January 7, 1997. Tapp was cooperative and truthfully denied any knowledge of or involvement in the crime.

62. Fuhriman, along with Grimes, Brown, Stacey, and Finn, set out on a continuous course of coercion, manipulation, threats, and false promises to secure a false confession from Tapp. At this point, Defendants' theory was that Hobbs was the sole perpetrator. Their aim in questioning Tapp was to pressure Tapp into providing evidence against Hobbs.

63. To pressure Tapp into implicating Hobbs, right from the start, Fuhriman lied to Tapp, telling him it looked like Tapp had been involved in Dodge's murder—despite Tapp's actual innocence, the lack of any evidence whatsoever connecting him to the crime, and the fact that Defendants' goal in this interrogation was to pressure Tapp into providing evidence against Hobbs. Fuhriman also, from the beginning, threatened to "fry" Tapp when Tapp said, truthfully, that he knew nothing about the crime.

64. Throughout this campaign of coercion, Fuhriman, Finn, Grimes, Brown, and Stacey acted either at Chief Livsey's direction or with his knowledge and consent.

65. Fuhriman, Grimes, Brown, Stacey, and Finn conducted this campaign of coercion under Livsey's supervision. When Tapp's mother tried to put a stop to the interrogations, Livsey

13

even personally intervened to try to convince Tapp's mother to let the interrogations continue.

66. Over the course of the next three weeks—between January 7, 1997, and February 1, 1997— Fuhriman, Brown, Stacey, Grimes, and Finn subjected Tapp to a total of nine interrogations and seven sham polygraph examinations, in sum about sixty hours. These interrogations lasted for hours at a time, and even during "breaks" Fuhriman, Brown, Stacey, Grimes, and Finn continued to coerce, manipulate, question, and pressure Tapp. Defendants also threatened Tapp with death multiple times, lied to him, and refused his requests for real breaks, even when the exhausted and often sobbing Tapp repeatedly begged for them.

67. Despite the absence of any evidence against him, Fuhriman arrested Tapp on January 11, 1997, on the charge that Tapp was an accessory to Dodge's murder.

68. Through the course of these interrogations, Defendants coerced, pressured, and manipulated Tapp into falsely confessing to this crime. Defendants' coercion included conducting seven polygraph examinations in which they repeatedly lied to Tapp and told him he had failed the polygraphs. Defendants' abuse of these sham polygraphs was not in the service of ascertaining the truth, but rather to overbear Tapp's will in order to coerce him into making several false confessions. Defendants also coerced Tapp by threatening him multiple times with death by electric chair and gas chamber.

69. Defendants conducted this campaign of coercion and manipulation despite learning of exculpatory DNA evidence that any reasonable officer would have realized proved Tapp's innocence. Yet, each and every time—rather than accept Tapp's innocence—Defendants instead, unreasonably, changed their theory of the case and manipulated Tapp into confessing to a new version of the story that fit whatever Defendants' current theory of the case was.

14

70. Defendants learned on January 17, 1997, that Tapp's and Hobbs's DNA did not match the semen found at the scene. Because the objective evidence at the scene indicated it was a single-perpetrator crime, any reasonable officer would have known that this DNA evidence conclusively excluded Tapp as the perpetrator of this crime. Nor could Tapp be Hobbs's accomplice when Hobbs was likewise conclusively excluded as the source of the semen left by the perpetrator.

71. But despite this conclusive evidence of Tapp's innocence, Defendants continued their campaign of coercion and manipulation to force Tapp to falsely confess to multiple versions of the crime that fit Defendants' evolving evidence and theory of the case.

72. Throughout the three-week gauntlet which Defendants put Tapp through, Defendants caused Tapp to falsely confess not once, but nearly half a dozen times to different versions of the crime. As Defendants learned new facts about the case, they coerced new confessions from Tapp to match their shifting theory of the case.

73. Defendants first coerced Tapp into saying, falsely, that though he had not been at Dodge's apartment the night of the murder, Hobbs had killed Dodge and then confessed to Tapp.

74. Defendants then forced Tapp to change this story a second time, perhaps realizing it would be better to have him as a witness to the crime itself: in this version, Defendants coerced Tapp to falsely state he had been with Hobbs at Dodge's apartment, that Hobbs had argued with Dodge, and that he witnessed Hobbs attack Dodge with a knife. In this version of Defendants' story, Tapp ran out of the building and hid before later re-entering the apartment and seeing Dodge's body.

75. This false and coerced confession did not match the evidence from the crime scene, as Defendants well knew. For example, Dodge's apartment door locked from the outside, and so

15

there was no way that Tapp could have left the apartment and then reentered without a key. But rather than acknowledge that the confessions that they had wrung from Tapp were false and that Tapp was completely innocent, Defendants pushed to have Tapp charged with the murder.

76. Yet shortly after Defendants coerced Tapp into making the second false confession, Defendants learned that neither Tapp nor Hobbs matched the DNA from the semen found on the victim, meaning that the most recent account of events Defendants coerced from Tapp did not match the actual evidence in the case: Neither Tapp nor Hobbs was the perpetrator.

77. And so Defendants pressured Tapp into "confessing" to yet another version of events. Defendants first fed Tapp the name of a third young man, Jeremy Sargis, just as they had fed Tapp Hobbs' name earlier. Defendants then coerced Tapp into falsely confessing that Tapp, Hobbs, and Sargis had entered Dodge's apartment, that Tapp saw Hobbs and Sargis sexually assault Dodge, and that Hobbs and Sargis then stabbed her. But DNA testing results a week later excluded Sargis as the source of the DNA at the scene, too.

78. Defendants then coerced and pressured Tapp into making a fourth "confession." But this time, Defendants did not have a name to feed Tapp. And so, this time, when Defendants coerced Tapp into saying that the third man was not Sargis, but another man who was with Tapp and Hobbs in Dodge's apartment, Tapp could only "confess" that he did not remember the third man's name. In this version of events, Defendants also coerced Tapp into "confessing" to having held down Dodge during the attack.

79. A few days later, Defendants coerced Tapp into making a fifth and final false "confession"— that Hobbs had threatened Tapp and forced Tapp to participate in the crime, and so Tapp had cut Dodge across the chest.

16

80. On February 3, 1997, a warrant of arrest was issued for Tapp and he was indicted by criminal complaint with murder in the first degree, in violation of Idaho Code §§ 18-4001, 18-4002, and 18-4003(a), and rape, in violation of Idaho Code §§ 18-6101(3), (4).

### *Defendants feed Tapp secret facts about the crime to fabricate a false confession from Tapp*

81. As none of the DNA at the scene matched Tapp, Hobbs, or Sargis, Defendants knew or should have known that the stories they had coerced Tapp into "confessing" to were false. So Defendants took steps to falsely bolster the appearance of reliability of Tapp's coerced confessions.

82. Because Tapp had nothing to do with the crime and therefore knew nothing about it, to make Tapp's "confessions" appear reliable, for every one of Tapp's coerced false confessions, Defendants Fuhriman, Brown, Stacey, Grimes, and Finn fed Tapp non-public details of the crime known only to the IFPD and the real perpetrator, Dripps.

83. During smoke breaks and other pauses in the interrogations, Defendants told Tapp the story they wanted him to tell and fed him non-public facts about the crime to weave into that story. They then falsely reported that those stories and facts originated with Tapp. Defendants also took Tapp to Dodge's apartment, where they threatened him with rape and death, and provided him with yet more non-public details about the crime.

84. For example, and without limitation:

   a. Defendants knew that Dodge had a long cut on her right breast from the autopsy and from viewing the crime scene and photographs of it. Defendants, including but not limited to Fuhriman, Grimes, Brown, and Finn, provided this fact to Tapp and then, when Tapp repeated that fact back to them, falsely reported that Tapp had volunteered that non-public fact. Defendants then misrepresented that the

only way that Tapp could have known that Dodge had a cut on her breast was if he had committed the crime. Fuhriman also falsely stated in his report that Tapp had volunteered that he had cut Angie across the right breast.

b. Defendants knew that Dodge had been hit in the face from the autopsy. Defendants, including but not limited to Fuhriman, Grimes, Brown, and Finn, provided this fact to Tapp and then falsely reported that Tapp had volunteered that non-public fact. They then misrepresented that the only way that Tapp could have known that fact was if he had committed the crime.

c. Defendants knew the layout of Dodge's apartment, including which entryway and porch led to that apartment. Defendants, including but not limited to Fuhriman and Finn, provided that information to Tapp and then falsely reported that Tapp had volunteered this non-public information. Defendants then misrepresented that the only way that Tapp could have known this was if he had been in Dodge's apartment before, and thus that his supposed knowledge of the apartment corroborated his confession.

d. Defendants knew that Dodge was found wearing sweatpants and a t-shirt, and that the sweatpants were found pulled halfway down Dodge's legs. Defendants, including but not limited to Fuhriman and Finn, provided this information to Tapp and then falsely represented that Tapp had volunteered this non-public fact. They then misrepresented that the only way that Tapp could have known that fact was if he had committed the crime.

85. Despite Defendants' lies that Tapp provided multiple inculpatory non-public facts to them over the course of their interrogations and polygraphs, in reality, and as Defendants knew, Tapp only knew these facts because Defendants had provided them to him.

### *Defendants fabricate additional inculpatory evidence against Tapp*

86. Not content with their coerced confessions and lies about the source of the nonpublic facts included in those confessions, Defendants, including but not limited to Fuhriman, also fabricated from whole cloth inculpatory evidence against Tapp.

87. For example, and without limitation, Fuhriman asked Tapp where semen would be found on Dodge's body. Defendants knew that semen had been found on Dodge's leg.

88. But Tapp, who is totally innocent of this crime and therefore had no idea where semen was found on Dodge's body, guessed wrong: He guessed that semen was found on her stomach.

89. Defendants, including Fuhriman, knew that the real perpetrator would know that semen would have been found on Dodge's leg, not her stomach. And so Defendants, including Fuhriman, fabricated that, although Tapp had said that semen might be located on Dodge's upper body, above her waist, Tapp had motioned to indicate that the semen would have been on her thighs.

### *Defendants shore up their false and fabricated confession by coercing a vulnerable young woman into falsely stating that Tapp had confessed to her*

90. Defendants knew that the evidence against Tapp was extraordinarily weak: a coerced and false confession only produced through hours of abusive and coercive polygraphs and interrogations and based solely on facts fed to Tapp by Defendants. And so Defendants set out to shore up their coerced confession by coercing a fabricated statement against Tapp from a vulnerable young woman named Destiny Osborne, whom Defendants could threaten and manipulate.

19

91. Osborne was just a teenager when Defendants decided to coerce a fabricated statement from her. At the time, Osborne was so heavily addicted to methamphetamine that, from 1996 to 1998, she spent time in a residential behavior health center for that addiction. Osborne did not know Hobbs and knew Tapp only as an acquaintance.

92. When Osborne first spoke to Defendants in February 1997, she told police that she had last seen Dodge the day before her murder, but had little other evidence to offer.

93. Undeterred by the truth, Defendants, including Fuhriman, Brown, Stacey, and Grimes decided to coerce and fabricate a false story from Osborne to corroborate the false and fabricated confession they had coerced from Tapp.

94. Osborne initially told Fuhriman, Brown, and Grimes honestly that she knew nothing about the crime and did not even know Hobbs.

95. But as with Tapp, Fuhriman, Brown, Grimes, and Stacey were unsatisfied with Osborne's truthful answer that she knew nothing about the crime. Instead, Fuhriman, Brown, Grimes, and Stacey repeatedly told Osborne that she had blocked out or suppressed the memory.

96. Fuhriman, Brown, Grimes, and Stacey also threatened to arrest Osborne unless she told them what they wanted to hear.

97. Finally, after Defendants' repeated interrogation and threats, Osborne agreed to falsely report that she had heard Tapp confess.

98. Fuhriman, Brown, Grimes, and Stacey then fed Osborne exactly the story they wanted her to tell. When she got something "wrong", they would "correct" her by telling her again what they wanted her to say.

99. Defendants thus coerced Osborne into falsely stating that she had been at a party after Dodge's murder and had overheard Tapp and Hobbs confess to the crime.

100. Brown then fabricated a report of Defendants' conversation with Osborne. That report stated that he had received a call from someone who worked at the residential treatment facility where Osborne was housed. Brown went on to report that he and Stacey had gone to speak with Osborne, who was "very nervous" and told them that she had overheard Tapp and Hobbs talking at a party about having murdered Dodge.

101. Brown's report was totally fabricated: Osborne did not know Hobbs; there was no such party; and Osborne never heard Tapp and Hobbs—who are totally innocent of this crime—confess.

102. Brown's report also completely omitted that he, Fuhriman, Grimes, and Stacey had spoken to Osborne multiple times, and that they had pressured, coerced, and threatened Osborne for hours before she finally made inculpatory false statements against Tapp. And Brown further omitted from his report that Defendants had fed Osborne the story they wanted her to tell. Instead, they falsely reported, just as they had done with Tapp, that the story came unprompted from Osborne.

103. Fuhrman, Brown, Grimes, and Stacey also failed to record or destroyed any recordings of their multiple conversations with Osborne.

104. On information and belief, given the high-profile nature of the investigation and Livsey's involvement in the interrogations of Tapp, Livsey knew or should have known that Fuhrman, Brown, Grimes, and Stacey had coerced and fabricated this false inculpatory report.

***Based on Defendants' false and fabricated evidence, Tapp is tried, convicted, and sentenced to life in prison***

105. Defendants knew or should have known that Tapp's confession and Osborne's statement were false, fabricated, and the result of Defendants' own suggestion, threats, and coercion.

106.    Defendants withheld from both the prosecutor and Tapp's defense attorneys that they had fed Tapp facts about the crime and then falsely claimed that those facts came from Tapp, that they had fabricated inculpatory evidence against Tapp, and that they had coerced and threatened Osborne into offering inculpatory false evidence against Tapp.

107.    Prior to trial, Tapp moved to suppress his confession on the grounds that he had been denied the right to counsel and that the interrogations were coercive. Fuhriman, Brown, and Stacey all testified at his suppression hearing. Fuhriman and Brown testified falsely, consistent with their earlier reports, that Tapp had volunteered non-public facts. Based on Defendants' false evidence, Tapp's motion was denied in substantial part.

108.    Tapp stood trial beginning May 12, 1998, on charges of murder in the first degree, rape, and deadly weapon enhancements in the commission of a felony. Prosecutors sought the death penalty.

109.    At trial, based on the false and fabricated evidence reported by Defendants, the prosecution argued that Tapp, with Hobbs, had raped and murdered Dodge.

110.    The jury was told that Tapp had confessed to participating in the rape and murder of Dodge, and that his confession was corroborated by the fact that he had provided multiple non-public facts, including that Dodge had been cut across the right breast, the location and layout of Dodge's apartment, that Dodge had been found wearing sweatpants pulled partway down her legs, and that semen had been found on Dodge's leg.

111.    But, because Defendants concealed their egregious misconduct from the prosecution and defense, the jury never learned that each and every one of the non-public facts—which the prosecution identified as evidence that Tapp had knowledge of the crime that only the real perpetrator could have known—had actually been fed to Tapp by Defendants.

22

112.   Osborne's testimony was also offered against Tapp. Based on Defendants' continued threats and coercion, Osborne gave the story that Defendants had fed her: that she had overheard Tapp and Hobbs confess at a party to murdering Dodge.

113.   Just as with Tapp's coerced false confession, because Defendants concealed their egregious misconduct from the prosecution and defense, the jury never learned that Osborne's testimony was false, fabricated, and fed to Osborne by Defendants.

114.   On May 28, 1998, based on Defendants' false and fabricated evidence, and after thirteen hours of deliberation, the jury returned guilty verdicts against Tapp on all counts.

115.   Following a sentencing hearing on December 10, 1998, at which the prosecutor pressed for a death sentence, the judge sentenced Tapp on December 11 to serve a sentence of life in prison plus 15 years and a fixed term of 30 years on the murder conviction and a term of 20 years with a fixed term of 10 years on the rape conviction.

116.   Although Tapp was prosecuted on a theory he had committed the crime with Hobbs, Hobbs was not prosecuted.

***Tapp's wrongful conviction was the result of unconstitutional policies and practices of the Idaho Falls Police Department***

117.   Tapp's wrongful conviction was also the direct result of the IFPD's unconstitutional investigative policies, practices, customs, and failure to supervise. First, the Chief of Police, Kent Livsey, was directly involved in supervising this high-profile investigation. On information and belief, Livsey was aware of the rampant misconduct in the Dodge investigation and at least tacitly endorsed it.

118.   The widespread and extraordinary misconduct in the Dodge investigation was also part of a broader pattern of IFPD investigative misconduct. No later than the early 1990s, the IFPD had a pattern, practice, and/or custom of unconstitutional conduct during criminal

investigations, including coercing or suggesting confessions, fabricating evidence, and systematically failing to supervise and discipline officers, including but not limited to Fuhriman, enabling such misconduct to persist. On information and belief, the City of Idaho Falls, through its policymakers, had prior notice of this pattern of unconstitutional misconduct, based on the open and notorious nature of the misconduct, including the acquiescence and participation of IFPD supervisors.

119.    This policy, practice, or custom involved the use of various techniques to coerce or fabricate confessions and/or incriminatory statements, including without limitation: the use of threats, false promises of leniency, psychological manipulation, sham polygraphs, leveraging or exploiting vulnerabilities of witnesses or suspects, including mental vulnerabilities, threatening criminal penalties, and perjury and false statements in police and court documents and proceedings.

120.    This policy, practice, or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation: providing a witness or suspect with details about the crime that only the real perpetrator or police could know, whether through leading questions or more direct communication; taking misleading steps to make coerced statements appear as if they originated from the suspect following a lawful interrogation; and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words.

121.    On information and belief, this policy, practice, or custom was either promulgated of the Idaho Falls Police Department's policymaker, or allowed to develop and continue, unabated, with his explicit knowledge and consent. That policymaker also failed to discipline the

multiple officers who engaged in this misconduct, further allowing these unconstitutional practices to continue.

122.    The Dodge murder investigation is itself a striking example of the IFPD's systemic failure to supervise, train, and discipline its officers and detectives. In this investigation alone, seven IFPD officers and detectives coordinated to coerce multiple false and fabricated confessions from a suspect and to coerce a false and fabricated witness statement. Moreover, this misconduct happened under the direct supervision of Livesey, the IFPD Chief of Police himself. If the IFPD had had a constitutionally adequate training and supervision structure, such widespread misconduct would not have occurred.

123.    Nor was Tapp's case an isolated incident. For example, in 1991, on information and belief, Fuhriman coerced a woman named Sylvia Canido into testifying that her ex-husband, Michael Whiteley, had raped and kidnapped her. Fuhriman, a church bishop in the Church of the Latter-Day Saints, threatened Canido with excommunication if she did not lie. On the basis of the false testimony that Fuhriman coerced from Canido, Whiteley was tried and convicted of rape and kidnapping and sentenced to life in prison.

124.    The City of Idaho Falls also had in force and effect a policy, practice, or custom of failing to adequately supervise and discipline IFPD officers in the exercise of their constitutional obligations, including their obligations not to fabricate evidence, commit perjury, or hide exculpatory evidence. This failure by policymakers to properly train, supervise or discipline their subordinates amounted to deliberate indifference to the rights of those who came into contact with IFPD officers.

***Tapp continues to fight to demonstrate his innocence with the help of his defense attorney, leading experts, the Innocence Project, and even the victim's mother***

125.    Even after his conviction, Tapp did not stop fighting to demonstrate his innocence. In the decades after his conviction Tapp filed an appeal and multiple unsuccessful petitions for post-conviction relief.

126.    By the mid-2000s, Tapp had found an unlikely ally in his fight to prove his innocence: Angie Dodge's mother, Carol Dodge.

127.    Years after her daughter's murder, Carol Dodge had decided to watch the tapes of Tapp's polygraphs and interrogations. And despite her belief at the time of Tapp's trial—based on misrepresentations by Defendants—that Tapp was guilty, watching those tapes in their entirety, combined with the exculpatory results of DNA testing, convinced her of Tapp's innocence. Carol Dodge then became one of Tapp's fiercest advocates.

128.    Carol Dodge, in coordination with Tapp's criminal defense attorney, John Thomas, reached out to experts in false confessions and polygraphs about Tapp's case.

129.    In 2012, Carol Dodge began to correspond with Retired Judge Michael Heavey of Judges for Justice.

130.    Judge Heavey investigated the case and enlisted the help of leading experts with long and distinguished careers at the FBI in crime scene investigation, proper interrogation practices, and the science and application of polygraphs.

131.    Together, Tapp, Carol Dodge, Judge Heavey fought to demonstrate Tapp's innocence.

***Defendants refuse to conduct additional investigation that would have exonerated Tapp years earlier***

132.    In 2001, post-conviction DNA testing of the semen found on Dodge's left leg had identified a partial profile of the then-unknown man who raped and murdered Dodge. That

profile was entered into the FBI's Combined DNA Index System ("CODIS") system, but returned no match.

133.    In 2008, after years of urging by Tapp's attorneys, including the Idaho Innocence Project, and the victim's mother, additional DNA testing on the hairs found at the crime scene determined that the hairs were consistent with the profile developed in 2001. That new, more complete profile was again entered into the CODIS system, but again returned no match.

134.    In 2009, the Idaho Innocence Project sent a letter to Defendant Steve Roos, the then-IFPD Chief of Police, explaining that a new technique called Familial, or low stringency, searching permitted law enforcement to compare DNA profiles to databases and identify possible relatives of a perpetrator. Because this technique could identify not only the exact match, but also the family members of a match, it was more comprehensive than the FBI's CODIS system.

135.    The Idaho Innocence Project's letter also explained that, while Idaho did not yet use this technique, the Innocence Project had contacted Colorado and California, and that those states were happy to help the IFPD run the samples taken from the crime scene and attempt to locate the as-yet unidentified source of the semen and hair found on Dodge's body, so long as the IFPD made the request. That letter even included a template email for Defendants to send, contact information for the appropriate people and entities in California and Colorado, a form with mailing instructions for the laboratory, and a list of the requirements for the use of California's database.

136.    Despite being handed this easy, straightforward, and obvious investigative step on a silver platter, Defendants, including but not limited to Roos, Fuhriman, Finn, Brown, Stacey, and/or Grimes, failed to act. On information and belief, based on Defendants' false

27

representations about the evidence, the Idaho State Police denied the request to compare the samples taken from the crime scene to the California and Colorado databases.

137.    The true murderer, Brian Dripps, lived in California after murdering Dodge, and had multiple children there.

138.    On information and belief, had Defendants, including Roos, sent the samples to the California and Colorado databases for low stringency testing, the true perpetrator, Dripps, would have been identified and Tapp would have been exonerated nearly a decade earlier. As a result of their refusal to conduct this simple investigatory act, Tapp continued to languish in prison for nearly another decade for a crime he did not commit.

### New evidence confirms Tapp's innocence—and Defendants do nothing to free him

139.    In September 2012, IFPD sent samples taken from Dodge's shirt and pants and a teddy bear from the crime scene to a DNA testing laboratory for additional, more advanced, DNA testing. In early 2013, Defendants received the report from that additional DNA testing. That testing compared those samples to Tapp and Hobbs' DNA and excluded both men as the source of the DNA found on the shirt, pants, and teddy bear. In other words, the results of the 2013 testing again conclusively excluded Tapp and Hobbs as the perpetrators.

140.    But, as part of that 2012–2013 testing, Defendants refused to conduct Y-STR testing on the original semen samples taken from Dodge's body, and so prevented the laboratory from creating a full Y paternal "profile" of the true perpetrator.

141.    Defendants' theory by the time of Tapp's final false confession, and the theory presented at trial, was that Tapp's role in the crime was assisting Hobbs as Hobbs raped Dodge. As a result, when the 2013 testing concluded that Hobbs and Tapp were excluded as the source of

any and all DNA found at the scene, Defendants knew or should have known that their theory of the case was wrong, and that Tapp was actually innocent.

142.    But, yet again, rather than acknowledge Tapp's innocence, Defendants, including but not limited to, on information and belief, Fuhriman, Finn, Brown, Stacey, Grimes, Livsey, and/or Roos, instead worked to keep Tapp wrongfully convicted and incarcerated.

143.    In 2013, Judge Heavey, together with Carol Dodge and John Thomas, enlisted the help of Steven Drizin, a professor at Northwestern University and one of the nation's leading experts in false confessions, to review the tapes and offer an opinion. Dr. Drizin produced a report on Defendants' interrogations of Tapp. That report examined at length the extraordinarily coercive behavior of the police and concluded that there was absolutely no evidence that Tapp was at the crime scene or that he participated in in the murder. Indeed, Dr. Drizin concluded: "The one certainty that emerges from the police investigation is that the rapist and murderer of Angie Dodge is still on the loose."

144.    Heavey, Carol Dodge, and Thomas also enlisted the help of a leading FBI expert in police practices, Gregg O. McCrary, who produced a report which determined that Defendants had "manipulated Mr. Tapp through a series of explicit threats and promises, used false evidence ploys, asked a host of leading questions and continually contaminated the interrogation by disclosing nonpublic details of the crime and crime scene." He concluded that "[t]his is a false confession."

145.    On May 1, 2013, Tapp's second Petition for Post-Conviction Relief was dismissed. Because of Defendants' determination to ignore evidence of Tapp's innocence and refusal to pursue evidence that might lead to the identification of the true murderer, Tapp remained wrongfully imprisoned for a crime he did not commit.

*While Tapp is fighting to prove his innocence, Defendants smear Tapp in the press*

146.    Even after multiple rounds of DNA testing had excluded Tapp as the perpetrator and numerous experts had determined that Tapp's confessions were false, Defendants continued to publicly and falsely claim that Tapp was guilty.

147.    In 2012, Fuhriman—then the Mayor of Idaho Falls—gave an interview to NBC Dateline, in which he lied and said that Tapp had provided non-public information that was "absolutely … not fed," and that there were "no doubts" in Fuhriman's mind that "Tapp is part of the homicide itself."

148.    In 2016, the Idaho Falls Police Department again falsely indicated to the press that Tapp was guilty.

*New advanced testing identifies the DNA profile of the true perpetrator*
*and again conclusively excludes Tapp*

149.    In 2014, a profile obtained from some, but not all, the semen taken from the crime scene was at last compared against a database operated by the Sorenson Molecular Genealogy Foundation and Ancestry.com. That testing identified the family tree of the true perpetrator.

150.    Over the next two years, Idaho Falls investigators attempted to trace this family line of the true perpetrator, but were unable to identify him.

151.    In 2016, Idaho Falls investigators finally allowed the Sorenson Molecular Genealogy Foundation to conduct Y testing of the DNA taken from the semen samples from Dodge's body and clothes, thus allowing for a complete Y DNA profile of all the perpetrator DNA found at the crime scene. This testing once again identified the profile of a single perpetrator—and conclusively excluded Tapp.

152.   This result yet again confirmed what Defendants knew or should have known all along: Only one person was responsible for the rape and murder of Angie Dodge, and that person was not Chris Tapp.

### The State finally agrees to release Tapp from prison—but refuses to exonerate him

153.   In 2017, faced with the totality of the evidence that Tapp and his defense attorneys had assembled since his conviction demonstrating that Tapp was not the perpetrator, the State finally agreed to release Tapp from prison.

154.   But despite the evidence of Tapp's innocence—Tapp's DNA did not match the DNA profile of the perpetrator and multiple experts had determined that Tapp's confession was coerced and false—the City refused to exonerate Tapp.

155.   Instead, the City offered Tapp a Hobson's choice: it offered to dismiss and vacate Tapp's rape conviction and consent to release Tapp from prison, but leave Tapp's wrongful murder conviction standing.

156.   Faced with such a choice, after having spent decades wrongfully imprisoned, Tapp agreed. On March 22, 2017, the court entered an order amending Tapp's conviction, dismissing his rape charge, and ordering Tapp released from prison.

### New DNA testing identifies the true perpetrator as Brian Dripps

157.   In the spring of 2017, Idaho Falls investigators submitted a portion of the semen sample for genetic genealogy testing. Once the expansive DNA profile was revealed, a genealogy laboratory used an ancestry database to identify third cousins of the unidentified source of the semen sample. The genealogist constructed a family tree from the third cousins and eventually identified the most likely source of the semen: Brian Dripps. Investigators realized that Dripps had resided across the street from Angie Dodge at the time of the murder.

158.     Investigators surreptitiously collected a cigarette butt that Dripps discarded and tested

that cigarette for DNA. The profile from the cigarette matched the DNA from the semen and

hair found on Dodge's body.

159.     On May 15, 2019, Dripps was brought in for questioning about Dodge's murder. He

admitted his guilt, explained that he had acted alone, and acknowledged that he did not know

Tapp.

160.     On May 16, 2019, the IFPD held a press conference in which they announced that they

had identified Dripps as the source of all the suspect DNA, including the semen, found at the

murder of Angie Dodge and that Dripps was being charged with the rape and murder of

Dodge.

161.     The IFPD spent the next eight weeks investigating and successfully verifying Dripps's

admission that he acted alone. Dripps is currently awaiting trial for the rape and murder.

162.     Because of Defendants' misconduct, not only did Tapp spend more than two decades

wrongfully convicted, but the true murderer remained free to commit other crimes for over

twenty years. Nor has there been, on information and belief, any serious attempt to determine

whether Dripps committed other violent felonies since he raped and murdered Dodge in

1996.

### *Destiny Osborne admits that her testimony against Tapp was false and the result of Defendants' coercion and misconduct*

163.     While Tapp continued to struggle to demonstrate his innocence from prison, Destiny

Osborne, the teenager whom Defendants had coerced into testifying against Tapp, finally

admitted the truth.

164.    In 2017, Osborne admitted to Carol Dodge that her trial testimony against Tapp had been false. She admitted that the story was entirely fabricated by Defendants and that she had only testified against Tapp because of Defendants' coercion.

165.    Later, Osborne confirmed this story in an interview with the *Idaho Falls Post Register*, telling the newspaper that she was "manipulated and coerced and fed a huge story and threatened 23 years ago . . . to falsely testify against Chris Tapp." She told the *Post Register* that she was "literally … fed what [she] did say."

### *Tapp is at last exonerated*

166.    Only *after* the true perpetrator, Dripps, had been arrested and confessed to raping and murdering Angie Dodge did the authorities agree to vacate and dismiss Tapp's wrongful murder conviction.

167.    On July 17, 2019, more than twenty-two years after Tapp was wrongfully arrested for a murder he did not commit, the Seventh Judicial District of Idaho Falls, County of Bonneville vacated and dismissed the remaining charges against Tapp. Upon doing so, Judge Alan Stephens stated, "[a]s far as this court is concerned, you are innocent of the convictions you have been living under for the past 20-plus years. I don't think any of us could imagine what it would be like to experience imprisonment for something we didn't do . . . I'm just glad it could be corrected at this time."

### DAMAGES

168.    Christopher Tapp spent more than twenty years incarcerated and twenty-two years wrongfully convicted for a horrific crime he did not commit. He must now attempt to make a life for himself without the benefit of those life experiences and resources that normally equip adults for that task.

33

169.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, grossly negligent, negligent, and/or deliberately indifferent acts and omissions, Tapp sustained injuries and damages including: loss of freedom for more than twenty years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading and other entertainment, travel, enjoyment, and expression, for which he is entitled to monetary relief.

170.    Additionally, the emotional pain and suffering caused by losing those years has been substantial. During his incarceration, Tapp was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Tapp missed out on the ability to share holidays, births, funerals, and other life events with loved ones, opportunities to fall in love, to marry, to have a family, and the fundamental freedom to live one's life as an autonomous human being.

171.    Losing his liberty just as he was finishing his teens, Tapp was deprived of some of the most significant and meaningful parts of life: the opportunity to raise a family and to pursue a career.

172.    Tapp also suffered uniquely from his lengthy wrongful incarceration and imprisonment. From the very first days of his incarceration, Tapp faced unusual, and serious, harms and injuries. Because Tapp was unjustly and falsely labeled as a "sex offender," he faced serious

threats in prison. In the spring or summer of 1997, Tapp was physically attacked by another inmate and suffered injuries and bruising, including to his face. This was not an isolated incident; numerous times throughout his over twenty years of wrongful imprisonment— indeed, nearly every year—Tapp suffered physical assaults.

173.    The injuries that Tapp suffered in prison did not stop at beatings. In 1998, he contracted tuberculosis as a result of exposure to prison conditions. But despite that diagnosis, Tapp was denied treatment for years. Although Tapp continued to suffer from tuberculosis throughout the entirety of his wrongful incarceration, he only received treatment for that illness once, in 2001, despite testing positive for tuberculosis repeatedly.

174.    In 2006, Tapp seriously injured his knee while doing work at the prison due to inadequate safety precautions. That injury causes Tapp to limp, and affects his quality of life, to this day.

175.    In 2006, Tapp suffered another sustained injury when a block of bleach exploded near him, melting his shoe and seriously burning his foot.

176.    In 2006, Tapp contracted pneumonia due to exposure from prison conditions. For over two weeks, Tapp suffered and grew sicker until he was too weak to get up or eat. Only after fifteen days, when Tapp could barely move, did prison officials finally provide Tapp with any treatment. This discrete injury has left Tapp with residual damage to his lungs.

177.    As a result of substandard dental care in prison, Tapp developed severe periodontitis and lost numerous teeth. Instead of providing proper treatment, the prison dentist simply extracted Tapp's teeth, including in 2002, 2005, 2007, and 2009. The prison refused to give him implants or dentures. As a result of missing teeth, Tapp cannot eat many regular foods. The loss of teeth has also caused him to be ashamed of his appearance and has had a dramatic negative affect on his social life.

178.    Beginning in about 2010, Tapp also suffered hearing loss as a result of the constant, heightened noise he experienced in prison.

179.    Tapp also suffered from severe mental health illnesses as a result of his wrongful imprisonment. In 2015, he was diagnosed with major depressive disorder diagnosis.

180.    While in prison, his father passed away. Tapp was unable to attend his funeral. Tapp's mother was forced to remortgage the family home to pay for her son's legal fees.

181.    Tapp continues to suffer as a direct result of his wrongful conviction and incarceration.

182.    Even if the City of Idaho falls and/or individual Defendants may not have expected or intended to wrongfully imprison an innocent man or cause these grave injuries, Defendants are nonetheless legally responsible under 42 U.S.C. § 1983 because these injuries are the foreseeable result of the Defendants' recklessness, negligence, or deliberate indifference to Tapp's rights; their policies and procedures; and their failure to train and supervise their employees.

## FEDERAL CLAIMS

### COUNT I

**42 U.S.C. § 1983 claim for Deprivation of Liberty Without Due Process of Law and Violation of Right to a Fair Trial, Under the Fourteenth Amendment, based on the fabrication of false evidence, including false confessions**

*Against Defendants Fuhriman, Finn, Grimes, Brown, and Stacey*

183.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

184.    Defendants Fuhriman, Finn, Grimes, Brown, and Stacey fabricated false evidence of Tapp's guilt, thereby violating Tapp's right to a fair trial and causing him to be deprived of his liberty without due process of law.

36

185.   As described in greater detail above, Defendants fabricated evidence in a number of ways prior to trial, and they did so knowingly or in reckless disregard for the truth. That fabricated evidence was used to arrest Tapp, to prosecute him, and was the basis for the jury's guilty verdict.

186.   Defendants, individually and in concert, falsely reported that Tapp had volunteered non-public information only the true perpetrator would know, when in fact Defendants had fed that information to Tapp.

187.   Defendants, individually and in concert, used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. For example, and without limitation, Defendants used manipulative polygraph examinations, threats, lies, and false promises in order to coerce five false confessions from Tapp.

188.   Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey, while acting under color of law, ignored evidence pointing to the true perpetrator, Brian Dripps, and/or failed to follow up on such evidence, thereby conducting a constitutionally inadequate investigation in violation of Tapp's Fourteenth Amendment Due Process right to a fair trial.

189.   Defendants, individually and in concert, deliberately fabricated the witness statement of Osborne through coercion, manipulation, and threats.

190.   Defendants, individually and in concert, continued their investigation of Tapp despite the fact that they knew or should have known that he was innocent based on the evidence collected from the crime scene.

191.   Evidence of Defendants' misconduct could have been used to undermine key evidence relied on by Defendants in this investigation. Had it been disclosed, it could have been used

at trial to impeach Defendants and witnesses at trial as well as the quality of the entire investigation.

192.    Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Tapp's defense. Had Defendants not engaged in such misconduct or had their misconduct been disclosed, the evidence would have tended to prove Tapp's innocence, cast doubt on the entire police investigation and prosecution, and most likely would have created a different result at trial.

193.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Tapp's federally protected rights. These acts were perpetrated while Defendants were acting under color of state law and in their capacities as employees or agents of the City of Idaho Falls.

194.    As a direct and proximate result of Defendants' actions, Tapp was wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced to life in prison, incarcerated for over twenty years, wrongfully convicted for over twenty-one years, and suffered the other grievous injuries and damages set forth above.

### COUNT II

**42 U.S.C. § 1983 claim for Deprivation of Liberty Without Due Process of Law and Violation of Right to a Fair Trial, Under the Fourteenth Amendment, based on withholding exculpatory evidence from the prosecution and defense**

***Against Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey***

195.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

196.    Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey withheld exculpatory evidence from the prosecution and defense, thereby violating the Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

38

197.   Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey, individually and in concert, in an effort to secure Tapp's conviction without regard to his actual innocence, deliberately and in bad faith deprived Tapp of his Due Process rights.

198.   Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey, individually and in concert, in an effort to secure Tapp's conviction without regard to his actual innocence, intentionally suppressed material, exculpatory and impeachment information from Tapp, his defense counsel, and the prosecution in violation of the Constitution and *Brady v. Maryland*, including without limitation failing to disclose the true circumstances of Destiny Osborne's statements, and failing to disclose information pointing to other suspects, including true perpetrator Dripps.

199.   Evidence of Defendants' misconduct could have been used to undermine key evidence relied on by Defendants in this investigation. Had it been disclosed, it could have been used at trial to impeach Defendants and witnesses as well as the quality of the entire investigation.

200.   Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Tapp's defense. Had Defendants not engaged in such misconduct or had their misconduct been disclosed, the evidence would have tended to prove Tapp's innocence, cast doubt on the entire police investigation and prosecution, and most likely would have created a different result at trial.

201.   The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Tapp's federally protected rights. These acts were perpetrated while Defendants were acting under color of state law and in their capacities as employees or agents of the City of Idaho Falls.

202.    As a direct and proximate result of Defendants' actions, Tapp was wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced to life in prison, incarcerated for over twenty years, wrongfully convicted for over twenty-one years, and suffered the other grievous injuries and damages set forth above.

### COUNT III

**42 U.S.C. § 1983 Claim for Post-Trial Deprivation of Liberty Without Due Process of Law Under the Fourteenth Amendment**
***Against Defendants Fuhriman, Finn, Grimes, Brown, Stacey, Livsey, and Roos***

203.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

204.    Defendants Fuhriman, Finn, Grimes, Brown, Stacey, Livsey, and Roos, individually and in concert, in an effort to preserve Tapp's conviction without regard to his actual innocence, intentionally or with deliberate indifference and in bad faith refused to take steps that they knew or should have known could have produced evidence of Tapp's innocence, in violation of the Constitution. For example, and without limitation, Defendants knew as of no later than 2009 that comparing the DNA profiles obtained from testing done from materials taken from the crime scene could have identified the true perpetrator.

205.    Had Defendants run this profile through the familial search databases of California and Colorado, on information and belief, the true perpetrator would have been identified over a decade earlier, and Tapp would have been released up to eight years earlier.

206.    Tapp had a liberty interest in proving his innocence, including through newly discovered exculpatory evidence.

207.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Tapp's

federally protected rights. These acts were perpetrated while Defendants were acting under color of state law and in their capacities as employees or agents of the IFPD.

208.   As a direct and proximate result of Defendants' misconduct, Tapp's incarceration was wrongfully extended, and Tapp continued to suffer all of the grievous injuries and damages set forth above.

**COUNT IV**

**42 U.S.C. § 1983 Claim for Malicious Prosecution and Violation of the Fourth and Fourteenth Amendments**

***Against Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey***

209.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

210.   Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey caused criminal proceedings to be brought against Tapp without probable cause and without any reasonable belief in guilt. Tapp is completely innocent of the rape and murder of Angie Dodge. As Defendants knew, the sole basis for the criminal action against Tapp was the false evidence that Defendants fabricated, while forensic evidence (including DNA) exculpated him. No reasonable officer in 1996 would have believed that fabricated evidence provided probable cause to arrest, and no reasonable officer in 1996 would have believed that an arrest and prosecution without probable cause was justified.

211.   Defendants also continued the prosecution against Tapp on the basis of this false and fabricated inculpatory evidence and suppressed material exculpatory evidence, thereby subjecting Tapp to ongoing seizure in violation of the Fourth and Fourteenth Amendments.

212.   The criminal proceedings against Tapp were initiated with malice. Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey caused the charges against Tapp to be filed by

knowingly providing the prosecution misinformation, concealing exculpatory evidence, and otherwise engaging in wrongful and bad faith conduct that caused the initiation of the legal proceedings against Tapp when they knew there was no probable cause.

213.   Defendants initiated the action against Tapp for the purpose of denying Tapp's constitutional rights, including his right to be free from unreasonable seizure, and his right to not be deprived of liberty without due process of law.

214.   As a direct and proximate result of Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey's actions, Tapp was wrongly arrested, detained, charged with rape and murder, prosecuted, convicted, sentenced to life in prison plus fifteen years and a fixed term of thirty years on the murder conviction and a term of twenty years with a fixed term of ten years on the rape conviction and suffered the other grievous injuries and damages set forth above.

215.   The criminal proceedings against Tapp terminated in his favor.

216.   On March 22, 2017, the District Court of the Seventh Judicial District of the State of Idaho entered an order amending Tapp's conviction, dismissing his rape charge, and vacating his sentence for that charge. This Order left Tapp's first-degree murder conviction in effect.

217.   After a hearing on July 17, 2019, the District Court of the Seventh Judicial District of the State of Idaho, In and For the County of Bonneville, issued an Order on July 25, 2019, vacating and dismissing Tapp's murder conviction based on actual innocence. On August 12, 2019, Tapp's criminal case, CR-1997-481, was dismissed pursuant to the ruling dismissing Tapp's murder conviction based on actual innocence.

**COUNT V**

**42 U.S.C. § 1983 Claim for Violation of the Right Against Self-Incrimination in Violation of the Fifth and Fourteenth Amendment**

***Against Defendants Fuhriman, Finn, Grimes, Brown, and Stacey***

218.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

219.   Although Tapp had nothing to do with Dodge's murder, Defendants repeatedly threatened, manipulated, and lied to Tapp in order to coerce five false and fabricated confessions from him in violation of his Fifth and Fourteenth Amendment rights.

220.   In particular, as described in detail above, the circumstances of Tapp's interrogation were highly coercive, including but not limited to the following:

   a.   Defendants Fuhriman, Finn, Grimes, Brown, and Stacey, individually and in concert, threatened Tapp, who was susceptible to suggestion, including with the death penalty.

   b.   Defendants Fuhriman, Finn, Grimes, Brown, and Stacey, individually and in concert, falsely promised that Tapp would be released without charges and granted leniency if he gave the false confessions that Defendants wanted him to give.

   c.   Defendants Fuhriman, Finn, Grimes, Brown, and Stacey, individually and in concert, repeatedly used polygraphs to attempt to convince Tapp that his memories were wrong and that he had been involved in the crime.

221.   These coercive interrogation techniques shock the conscience and violate the decencies of civilized conduct. By interrogating Tapp in this manner and doing nothing subsequent to stop the violation, Defendants set in motion a series of acts by others which they knew or reasonably should have known would cause these statements to be used against Tapp at trial, thereby inflicting constitutional injury.

222.   As a direct and proximate result of Defendants' actions, Tapp was wrongly arrested, detained, charged with murder, prosecuted, convicted, and sentenced to life in prison plus 15 years and a fixed term of 30 years on the murder conviction and a term of 20 years with a fixed term of 10 years on the rape conviction.

## COUNT VI

### 42 U.S.C. § 1983 Civil Rights Conspiracy Claim

### *Against Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey*

223.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

224.   Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey, and others yet unknown, including without limitation individuals outside of the IFPD, agreed among themselves to act in concert to deprive Tapp of his clearly established constitutional rights as protected by the Fourth, Fifth, and Fourteenth Amendments, including his right not to be deprived of liberty without due process of law and be free from illegal seizure.

225.   As described in detail above, in furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to the following:

   a.   Acting in concert to suggest, coerce, and fabricate Tapp's five false confessions;

   b.   Acting in concert to conceal that Tapp's confessions were false, fabricated, and otherwise tainted;

   c.   Acting in concert to suggest, coerce, and/or fabricate inculpatory statements from Destiny Osborne; and

    d.   Acting in concert to conceal that Osborne's statement was false, fabricated, and otherwise tainted;

    e.   Prior and subsequent to Tapp's arrest, charging, and indictment, deliberately ignoring and/or recklessly failing to investigate evidence of Tapp's innocence.

226.   As a direct and proximate result of Defendants' overt acts, Tapp was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for over twenty years; and subjected to other grievous injuries and damages as set forth above.

**COUNT VII**

**42 U.S.C. § 1983 Supervisory Liability Claim**

***Against Defendants Livsey and Roos***

227.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

228.   Tapp's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration was caused by the unconstitutional action and inaction of Defendant Livsey acting in his individual capacity and under color of law.

229.   Upon information and belief, Defendant Livsey directly participated in the misconduct that resulted in Tapp's wrongful conviction, including but not limited to directing or permitting Defendants Fuhriman, Finn, Grimes, Brown, and Stacey to coerce false and fabricated statements from Tapp.

230.   Upon information and belief, Defendant Livsey was personally aware of the misconduct engaged in by his subordinate officers, who were under his direct supervision and given the small size of the IFPD and the high-profile nature of the investigation into the murder of Angie Dodge. Defendant Livsey's misconduct included but was not limited to the following:

45

a.  Defendant Livsey knowingly refused to come forward with information that would have terminated the wrongful prosecution of Tapp, which, upon information and belief, he knew or should have known had been initiated based on the coerced, fabricated confession of Tapp and the coerced and fabricated statement of Osborne, as well as in spite of suppressed exculpatory information. As a result, Livsey knew or reasonably should have known that Tapp's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

b.  Defendant Livsey culpably failed to adequately train, supervise, and/or control his subordinates, who obtained coerced, fabricated, or suggested identifications, and suppressed exculpatory information.

c.  Defendant Livsey violated Tapp's constitutional rights by acquiescing in the deprivation of Tapp's constitutional rights by his subordinates, and by generally showing a reckless or callous indifference to Tapp's rights, including but not limited to Tapp's rights to be free of unconstitutional interrogation methods.

d.  Defendant Livsey's failure to train, supervise, and/or control his subordinates, his indifference to the actions of his subordinates, and his indifference to Tapp's rights, encouraged and permitted his subordinates to fabricate evidence and to fail to document and disclose exculpatory evidence.

231.  Upon information and belief, Defendant Roos was personally aware of the misconduct engaged in by his subordinate officers, who were under his direct supervision and given the small size of the IFPD and the high-profile nature of the investigation into the murder of Angie Dodge. Defendant Roos's misconduct included but was not limited to the following:

a. Upon information and belief, Defendant Roos was aware of and/or participated in the decisions to deny and delay post-conviction DNA testing and analysis that would have identified the true perpetrator, and thus led to Tapp's exoneration, years earlier.

b. Upon information and belief, Defendant Roos violated Tapp's constitutional rights by acquiescing in the deprivation of Tapp's constitutional rights by his subordinates, and by generally showing a reckless or callous indifference to Tapp's rights, including but not limited to Tapp's rights to receive post-conviction exculpatory evidence.

232. The actions and omissions of Defendants Livsey and Roos, in their individual capacities, caused Tapp to suffer the constitutional deprivations and grievous personal injuries and damages described above.

**COUNT VIII**

**42 U.S.C. § 1983 Failure to Intervene**

***Against Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey***

233. Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

234. By their conduct and under color of state law, Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Tapp to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference declined to do so. No reasonable officer in 1996 would have believed this conduct was lawful. Defendants' failures included but are not limited to:

a. Failing to intervene to prevent or stop the pressure, threats, manipulation, and coercion of false and fabricated confessions by Tapp;

b. Failing to intervene to prevent or stop the pressure, threats, manipulation, and coercion of a false and fabricated witness statement by Osborne;

c. Failing to intervene to inform the prosecution, court, and defense that other officers were presenting fabricated evidence in Tapp's prosecution; and

d. Failing to intervene to prevent the withholding or concealing of exculpatory evidence from the prosecution and defense.

235. Defendants' failures to intervene violated Tapp's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1996 would have believed that failing to intervene to prevent Defendants from fabricating inculpatory evidence, concealing and withholding exculpatory evidence, or causing Tapp to be arrested and prosecuted without probable cause, were lawful.

236. Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Tapp's injuries. Defendants knew, or should have known, that their conduct would result in Tapp's wrongful arrest, prosecution, conviction, and incarceration.

237. The actions and omissions of Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey, in their individual capacities, caused Tapp to be wrongly arrested, detained, charged with rape and murder, prosecuted, convicted, sentenced, and incarcerated for over twenty years. As a result, Tapp suffered the constitutional deprivations and grievous personal injuries and damages described above.

**Count IX**

**42 U.S.C. § 1983 *Monell* Claim for Direct Involvement of Policymakers**

***Against Defendant the City of Idaho Falls***

238.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth

herein, and further alleges as follows:

239.    Defendant the City of Idaho Falls was at all times relevant to this Complaint responsible

for the policies, practices, and customs of the Idaho Falls Police Department.

240.    Defendant the City of Idaho Falls created and maintained a custom, policy and/or practice

of unconstitutional misconduct in homicide investigations, including but not limited to the

encouragement and use of, and reliance on, suggestive and/or coercive techniques during

interviews and interrogations to obtain false statements and confessions, and/or witness

statements that law enforcement knew or should have known were false, the fabrication of

inculpatory evidence, the suppression of exculpatory and/or impeachment evidence, and the

intentional failure to conduct adequate investigations of crimes.

241.    Upon information and belief, Defendant Livsey, as the chief policymaker for the City of

Idaho Falls and the Idaho Falls Police Department, was personally aware of the misconduct

engaged in by his subordinate officers, who were under his direct supervision, given the

small size of the IFPD and the high-profile nature of the investigation into the murder of

Angie Dodge.

242.    On information and belief, Defendant Livsey, the Chief of Police and relevant

policymaker for the Idaho Falls Police Department and the City of Idaho Falls, was directly

aware of and/or participated in that misconduct and failed to train, discipline, or supervise his

subordinate to prevent or ameliorate that misconduct.

243.   In addition, the City of Idaho Falls created and maintained a custom, policy and/or practice of unconstitutional misconduct of failing to take basic investigatory steps post-conviction when doing so would be likely to yield evidence that a person had been wrongfully convicted.

244.   On information and belief, Defendant Roos, as Chief of Police, and Defendant Fuhriman, as mayor of Idaho Falls, as the chief policymakers for the City of Idaho Falls and the Idaho Falls Police Department, were directly aware of and/or participated in that misconduct and failed to train, discipline, or supervise his subordinate to prevent or ameliorate that misconduct.

245.   Tapp's wrongful arrest, confinement, prosecution, trial, conviction, incarceration, and other injuries as set forth above were caused by the unconstitutional policies, practices, and customs of the City of Idaho Falls.

## COUNT X

**42 U.S.C. § 1983 *Monell* Claim Failure to Train, Supervise, or Discipline in Constitutionally Adequate Investigation Techniques, Interrogation Procedures, or *Brady* duties**
***Against Defendant the City of Idaho Falls***

246.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

247.   Defendant the City of Idaho Falls was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Idaho Falls Police Department.

248.   Defendant the City of Idaho Falls created and maintained a custom, policy and/or practice of unconstitutional misconduct in homicide investigations, including but not limited to the encouragement and use of, and reliance on, suggestive and/or coercive techniques during interviews and interrogations to obtain false confessions and statements, and/or witness

statements that law enforcement knew or should have known were false, the fabrication of inculpatory evidence, the suppression of exculpatory and/or impeachment evidence, and the intentional failure to conduct adequate investigations of crimes.

249.     The City of Idaho Falls, by and through its policymakers, created and maintained a custom, policy, or practice of failing to train, supervise, or discipline its employees and agents, including Defendants, regarding constitutionally proper investigation procedures, including but not limited to interrogation procedures.

250.     The City of Idaho Falls, by and through its policymakers, created and maintained a custom, policy, or practice of failing to train, supervise, or discipline its employees and agents, including Defendants, regarding their obligations to document and disclose exculpatory evidence pursuant to their *Brady* obligations.

251.     The unconstitutional customs, policies, patterns, and practices of the City of Idaho Falls have caused other individuals, other than Tapp himself, to be prosecuted or convicted on the basis of false and fabricated evidence, including but not limited to Michael Whiteley.

252.     These unconstitutional customs, policies, and practices of the City of Idaho Falls proximately and directly caused Tapp's physical and constitutional injuries, including his false arrest, illegal confinement, unfair trial, wrongful conviction, and other damages described above.

## IDAHO STATE LAW CLAIMS

## COUNT XI

**State Law Claim for Malicious Prosecution**

***Against Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey***

253.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

254.   Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey caused criminal proceedings to be brought against Tapp without probable cause and without any reasonable belief in guilt. Tapp is completely innocent of the rape and murder of Angie Dodge. As Defendants knew, the sole basis for the criminal action against Tapp was the false evidence that Defendants fabricated, while forensic evidence (including DNA) exculpated him. No reasonable officer in 1996 would have believed that fabricated evidence provided probable cause to arrest, and no reasonable officer in 1996 would have believed that an arrest and prosecution without probable cause was justified.

255.   Defendants also continued the prosecution against Tapp on the basis of this false and fabricated inculpatory evidence and suppressed material exculpatory evidence, thereby subjecting Tapp to ongoing seizure.

256.   The criminal proceedings against Tapp were initiated with malice. Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey caused the charges against Tapp to be filed by knowingly providing the prosecution misinformation, concealing exculpatory evidence, and otherwise engaging in wrongful and bad faith conduct that caused the initiation of the legal proceedings against Tapp when they knew there was no probable cause.

257.   As a direct and proximate result of Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey's actions, Tapp was wrongly arrested, detained, charged with rape and murder, prosecuted, convicted, sentenced to life in prison plus fifteen years and a fixed term of thirty years on the murder conviction and a term of twenty years with a fixed term of ten years on the rape conviction and suffered the other grievous injuries and damages set forth above.

258.    The criminal proceedings against Tapp terminated in his favor.

259.    On March 22, 2017, the District Court of the Seventh Judicial District of the State of Idaho entered an order amending Tapp's conviction, dismissing his rape charge, and vacating his sentence for that charge. This Order left Tapp's first-degree murder conviction in effect.

260.    After a hearing on July 17, 2019, the District Court of the Seventh Judicial District of the State of Idaho, In and For the County of Bonneville, issued an Order on July 25, 2019, vacating and dismissing Tapp's murder conviction based on actual innocence. On August 12, 2019, Tapp's criminal case, CR-1997-481, was dismissed pursuant to the ruling dismissing Tapp's murder conviction based on actual innocence.

## COUNT XII

### State Law Claim for False Imprisonment

#### *Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey*

261.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

262.    The conduct of the above-named Defendants directly resulted in the false imprisonment of Tapp while acting in the scope of their employment for the Idaho Falls Police Department and the City of Idaho Falls.

263.    Tapp's liberty of movement and freedom to remain in the place of his own lawful choice was violated by his wrongful conviction causing him to be restrained against his will.

264.    The restraint of Tapp against his will was caused by Defendants Fuhriman, Finn, Grimes, Brown, Stacey, and Livsey's intentional conduct in fabricating evidence, coercing false confessions, and concealing exculpatory evidence.

265.    As a direct and proximate result of Defendants' actions, Tapp suffered the grievous injuries and damages set forth above.

**COUNT XIII**

**State Law Claim for Intentional Infliction of Emotional Distress**

*Against Defendants Fuhriman, Finn, Grimes, Brown, Stacey, Livsey, and Roos*

266.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

267.    Tapp has suffered serious and severe emotional distress as a direct and proximate result of Defendants Fuhriman, Finn, Grimes, Brown, Stacey, Livsey, and Roos's extreme, outrageous, and intentional acts in both unlawfully obtaining his wrongful conviction and by failing to turn over evidence directly proving his innocence.

268.    Defendants Fuhriman, Finn, Grimes, Brown, Stacey, Livsey, and Roos committed this misconduct intentionally while acting in the scope of their employment for the Idaho Falls Police Department and the City of Idaho Falls.

269.    Tapp's serious and severe emotional distress was a reasonably foreseeable consequence of Defendants' actions.

270.    As a direct and proximate result of Defendants' actions, Tapp has suffered and continues to suffer emotional distress which has been accompanied by physical manifestations, including anxiety, depression, extreme stress, and other ailments.

**COUNT XIV**

**State Law Claim for Negligent Infliction of Emotional Distress**

*Against Defendants Fuhriman, Finn, Grimes, Brown, Stacey, Livsey, and Roos*

271.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

272.    Tapp has suffered and continues to suffer serious and severe emotional distress as a direct and proximate result of Defendants Fuhriman, Finn, Grimes, Brown, Stacey, Livsey, and

54

Roos's negligent acts in both unlawfully obtaining his wrongful conviction and by failing to take steps that would have led to his exoneration years earlier.

273.     Defendants Fuhriman, Finn, Grimes, Brown, Stacey, Livsey, and Roos committed this misconduct while acting in the scope of their employment for the Idaho Falls Police Department and the City of Idaho Falls.

274.     Tapp's serious and severe emotional distress was a reasonably foreseeable consequence of Defendants' actions.

275.     As a direct and proximate result of Defendants' actions, Tapp has suffered emotional distress which has been accompanied by physical manifestations, including anxiety, depression, extreme stress, and other ailments.

**Count XV**

**State Law Claim for Invasion of Privacy**

***Against Defendant Fuhriman***

276.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

277.     Fuhriman placed Tapp in a false light in the public eye by making false and injurious public statements to the press, that Tapp was guilty of the murder of Angie Dodge. Fuhriman made these statements even though he knew or should have known that Tapp was innocent.

278.     Fuhriman committed this misconduct while acting in the scope of their employment for the Idaho Falls Police Department and the City of Idaho Falls.

279.     As a direct and proximate result of Defendant's actions, Tapp has suffered the grievous harms and injuries set out more fully above.

## COUNT XVI

### State Law Claim for Vicarious Liability

### *Against Defendant the City of Idaho Falls*

280.   Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

281.   At all times relevant herein, the City of Idaho Falls was the employer of Defendants Fuhriman, Finn, Grimes, Brown, Stacey, Livsey, and Roos. As such, all acts or omissions by these defendants, as an agent for the City of Idaho Falls, were the acts and omissions of their principle, City of Idaho Falls.

282.   As an employer, the City of Idaho Falls is liable for all damages caused by its agents, as described herein, while acting within the scope of their employment.

283.   As an employer, the City of Idaho Falls is responsible for all its employees' actions that were in furtherance of or incidental to the employment.

### JURY DEMAND

284.   Pursuant to the Seventh Amendment of the United States Constitution, Tapp requests a jury trial on all issues and claims set forth in this Complaint.

### PRAYER FOR RELIEF

WHEREFORE, Tapp demands judgment jointly and severally against Defendants as follows:

A. That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial but that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction over this action;

B. That the Court award punitive damages to him, and against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E. For any and all other relief to which he may be entitled.

Respectfully submitted,

Dated: October 8, 2020

By:    /s/Peter Neufeld_____
       Peter Neufeld
       Nick Brustin
       Anna Benvenutti Hoffmann
       Katie McCarthy
       Kate Fetrow
       Neufeld Scheck & Brustin, LLP
       99 Hudson Street, 8th Floor
       New York, NY 10013

       /s/John Thomas_____
       John Thomas
       166 Martinsburg Lane
       Idaho Falls, ID 83404

       *Attorneys for Plaintiff Christopher Tapp*